UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL P. HILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:18 CV 1329 DDN |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Michael P. Hill for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Act, 42 U.S.C. §§ 401- 434, 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born on August 4, 1969, and was 47 years old at the time of his hearing. (Tr. 104.) He filed his applications on August 2, 2015, alleging a November 7, 2014 onset date. He alleged disability due to bipolar disorder, vascular insufficiency, neuropathy in his feet and legs, schizophrenia, memory loss, and learning disability. (Tr.

---

[1] The Court takes judicial notice that on June 4, 2019, the Hon. Andrew M. Saul became the Commissioner of Social Security. See https://www.congress.gov/nomination/116th-congress/94. Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill as defendant in this action. No further action needs to be taken to continue this suit by reason of 42 U.S.C. § 405(g) (last sentence).

164.) His application was denied, and he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 208-09.)

On January 24, 2018, following a hearing, an ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 10-24.) The Appeals Council denied his request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to his appeal. Throughout the relevant period, November 2014 through January 2018, plaintiff was treated for coronary artery disease and peripheral vascular disease, a progressive circulation disorder. (Tr. 420-64, 565-83, 616-831, 1034-60.) Plaintiff was a long time tobacco user and had a history of alcoholism and fetal alcohol syndrome. His treating physicians were David German, M.D., a wound care specialist and plastic surgeon, and Vito Mantese, M.D., a vascular surgeon, both within the Mercy Hospital St. Louis system.

On July 15, 2015, plaintiff saw Dr. Mantese for leg pain and swelling. Examination revealed minor skin changes on both ankles with darkened skin and induration or loss of elasticity and pliability. He had a normal gait and station. His motor and sensory functions were equal bilaterally. Dr. Mantese assessed superficial venous incompetency bilaterally and right popliteal vein incompetency with no evidence of deep vein thrombosis or incompetency. He recommended symptomatic treatment, continued use of support stockings and moisturizing cream, and regular exercise. (Tr. 1049-53.)

On January 26, 2016, plaintiff saw Ksenija Kos, M.D., to establish care. Plaintiff had suffered from lower extremity symptoms since age thirteen. On examination, he had no edema or clubbing, but positive cyanosis or severe discoloration of his feet from poor

circulation, and diminished pulses over the anterior tibial arteries. His motor bulk and strength were within normal limits. Plaintiff had a mild decrease in sensation distally in his feet up to his knees. His postural stability was normal and his gait was steady. An electromyography (EMG) and nerve conduction study was "mildly" abnormal, suggesting "mild" sensory peripheral neuropathy. Dr. Kos directed him to take preventative measures, including 30 minutes of moderate exercise three times per week. (Tr. 608-14.)

Plaintiff saw Dr. Mantese again on February 17, 2016, for leg pain and swelling. He had minor skin changes on both ankles with induration. He had a normal gait and station with normal motor and sensory function. Dr. Mantese told him he needed to continue wearing support stockings and using moisturizing cream and discussed the importance of regular exercise. (Tr. 1043-47.)

Plaintiff saw Dr. German on March 8, 2016 for assessment of his lower leg edema. He had seen a physician in the past who ordered him to wear compression stockings, but he had not worn them since June 2015. On examination, plaintiff had bilateral lower extremity edema characterized as "mild" with chronic stasis changes with hyperpigmentation and some lymphedema. He had small areas of hyperkeratosis (thickening of the skin's outer layer) but no ulcers. Dr. German instructed him to control his leg swelling by elevation and limiting sodium. He was also instructed to wash his legs and apply lotion daily, and to wear compression stockings and replace them every six months. The cost of the stockings was a problem for him, however. He was also advised to lose weight and exercise. Plaintiff was noted to be elevating his legs about 8 to 16 hours a day. (Tr. 623-29.)

Plaintiff returned to Mercy on May 4, 2016, for edema and lower extremity pain. He was asked to bring in a photo documenting his swelling. Notes describe his lower extremity edema as "minimal." He was prescribed Gabapentin, used to treat neuropathic pain. His doctor's instructions included leg elevation, among other things. (Tr. 659-64.)

On June 15, 2016, plaintiff was seen again at Mercy. He was not wearing any form of compression due to hot weather. He stated he had been following a low sodium diet and walking. Examination showed mild lower extremity edema and was otherwise unchanged. He was again instructed to document his swelling with pictures. He was not compliant with his Gabapentin prescription and was instructed on taking it on a routine basis. Plaintiff was again ordered to elevate his legs. (Tr. 702-07.)

At his next appointment at Mercy on September 29, 2016, plaintiff stated that he had tried to increase his walking but had increased swelling. His examination showed mild lower extremity edema. His swelling remained stable. He had no open wounds or ulcers. His treatment plan included compression stockings, weight loss, and exercise. (Tr. 738-41.) The "discharge instructions" under "wound care" stated to elevate the legs for 30 to 60 minutes. In another section labeled "general wound care" instructions stated to elevate legs as much as possible, as well as to avoid smoking, apply pressure to wound, and eat enough protein and calories to aid in healing the wound. (Tr. 738-47.)

At a June 26, 2017 appointment with Dr. Mantese, plaintiff's pain had worsened since his last visit. He rated his pain as a 10/10. His doctor ordered a venous reflux study. He was instructed to wear support stockings and exercise regularly. He had some swelling and skin changes. Plaintiff had a normal gait and station and no motor or sensory deficits. (Tr. 1037-42.)

**ALJ Hearing**

On August 3, 2018, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 100-45.) In addition to mental health problems, his ability to hold a job has declined because his feet and legs are getting worse. (Tr. 113.) He was not able to maintain good attendance at one of his jobs at a temporary service because of his feet and legs. (Tr. 120). He has limited blood flow in his legs and feet, requiring him to be off his feet and to frequently alternate between sitting, standing, and walking. His feet

ache and swell up like watermelons. (Tr. 122-25.) His physician, Dr. German, instructed him to do as little as possible, elevate his feet and legs throughout the day, and prop his legs up to heart level. (Tr. 143-44.)

A vocational expert (VE) also testified at the hearing. The ALJ asked the VE to consider a hypothetical individual limited by what would later form the ALJ's RFC finding. The VE opined that plaintiff's past work would be precluded. However, the VE stated that other work would be available in the national economy, including housekeeper/cleaner, marker, and ticket taker. (Tr. 137-44.)

### III.   DECISION OF THE ALJ

On January 24, 2018, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 10-24.) At Step One, the ALJ found that plaintiff had not performed substantial gainful activity since November 7, 2014, his alleged onset date. At Step Two, the ALJ found that plaintiff had severe impairments that included peripheral neuropathy, bilateral lower extremity edema, bipolar disorder, schizoaffective disorder, and post-traumatic stress disorder (PTSD). However, the ALJ found plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in the Listings, 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 12-17.)

The ALJ determined that plaintiff retained the residual functional capacity (RFC) to perform "light" work, except that he could not climb ladders, ropes, or scaffolds and he could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He must avoid all exposure to operational control of moving machinery and unprotected heights. He was limited to simple, routine repetitive tasks in a work environment free of fast-paced production requirements, although end-of-the-workday quotas were acceptable, as were simple work related decisions, and few workplace changes. Plaintiff's job requirements could not require public interaction, and interaction with co-

workers had to be casual and infrequent with no tandem tasks, and occasional supervision. (Tr. 17.)

At Step Four, the ALJ found that plaintiff was unable to perform any of his past relevant work. At Step Five, the ALJ found plaintiff's impairments would not preclude him from performing work that exists in significant numbers in the national economy, including work as a housekeeper/cleaner, marker, and ticketer. Consequently, the ALJ found that plaintiff was not disabled under the Act. (Tr. 22-23.)

## IV. GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to his PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred by failing to include a description of his medical need to elevate his legs in his RFC. He also argues the ALJ's Step Five finding is not supported by substantial evidence because there was no evidence of the availability of other jobs by region.

**1. Description of Medical Need to Elevate Legs in RFC**

Plaintiff argues the ALJ erred in failing to include his medical need to elevate his legs in his RFC. He argues that he presented substantial evidence in support of his hearing testimony that he is under medical orders to elevate his legs during the day to alleviate swelling or edema caused by peripheral vascular disease. He argues the ALJ's RFC finding was pivotal to the outcome of his claim, and that the ALJ erred by inaccurately minimizing the evidence of his need to elevate his legs, and by eliminating any such functional restriction from the RFC finding. This Court disagrees.

As to his RFC determination, the ALJ stated that the record did not indicate the treating or examining medical professionals advised or encouraged him to elevate his legs regularly. (Tr. 20.) The ALJ stated that he reviewed medical findings, which did not establish that plaintiff's edema and peripheral neuropathy would result in disabling functional limitations. (Tr. 20-22.) An EMG and nerve conduction study indicated that his neuropathy was "mild." (Tr. 613.) His motor and sensory functions were repeatedly found to be normal. (Tr. 612, 1041-42, 1047, 1053.) Other medical findings indicated that his gait and station were consistently intact. (Tr. 613, 1041-42, 1047, 1053.) The record also consistently characterized plaintiff's lower extremity edema as "mild." (Tr. 612, 628, 663, 707, 741.) Due to the lack of significant edema findings on examination, plaintiff's physicians asked him on several occasions to document his swelling, which he never did. (Tr. 20, 624-25, 629, 660, 664-66, 670-72, 676.) The record evidence did not substantiate plaintiff's testimony that his feet would swell up "like watermelons" while on his feet or sitting down. (Tr. 123.) The record evidence showing mild edema was inconsistent with plaintiff's purported need to consistently elevate his legs.

The ALJ also considered plaintiff's noncompliance with recommended treatment. (Tr. 20.) His physicians consistently instructed him to wear compression/support stockings to control his edema. (Tr. 598, 623, 631, 657, 660, 738, 1037, 1049, 1055.) However, in March 2016, he indicated he had not worn his compression stockings for nine months. (Tr. 623.) In June 2016, he again presented to an appointment not wearing compression stockings. (Tr. 702.) The ALJ properly considered his noncompliance when weighing plaintiff's subjective complaints. See Wildman v. Astrue, 596 F.3d 959, 965 n.3 (8th Cir. 2010).

Further, although plaintiff testified that his doctors instructed him to do as little as possible, his testimony is not supported by the record evidence. (Tr. 20, 144.) The record evidence shows plaintiff was repeatedly instructed by his treating physicians to increase his exercise. (Tr. 426, 446, 624, 659, 704, 738, 862, 1037, 1043, 1049.) See

Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013) (medical recommendations to increase physical exercise are inconsistent with plaintiff's claim of disability and that his doctors instructed him to do as little as possible.)

Finally, the ALJ considered that plaintiff had worked for many years despite developing his leg problem at age 13. (Tr. 22, 295, 427). The ability to work for many years with a condition, in the absence of evidence of significant deterioration, weighed against plaintiff's subjective reports. See Bryant v. Colvin, 861 F.3d 779, 782 (8th Cir. 2017). Based on all of these factors, the ALJ determined that plaintiff's edema was not as limiting as he alleged. (Tr. 20-22). See Forte v. Barnhart, 377 F.3d 892, 897 (8th Cir. 2004) (ALJ's RFC determination and resulting hypothetical question need only include those impairments and limitations that are well supported by the record as a whole).

Plaintiff argues that the ALJ failed to acknowledge that the record showed that he was instructed to elevate his legs on several occasions. The ALJ acknowledged that plaintiff was instructed to elevate his legs by emergency room physicians. (Tr. 20.) However, the fact that he did not mention those instructions when describing every emergency room visit was not error. See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (ALJ is not required to discuss every piece of evidence.)

Further, the source of plaintiff's statement that he was instructed to elevate his legs "as much as possible" is not entirely clear. That language is contained in a "wound care" handout given at the time of two visits to the Hyperbaric and Wound Care Clinic. (Tr. 632, 745-46.) However, the record is clear that plaintiff had no open wounds at those visits. (Tr. 628, 743). The language quoted by plaintiff came from "general wound care" instructions on the same form which directed patients generally to elevate 30 to 60 minutes a day (Tr. 631, 745-46.) There is nothing to indicate that any order to elevate "as much as possible" was a specific, ongoing order given to plaintiff on a long-term basis.

## 2. Step Five Finding and Vocational Expert's Testimony

Plaintiff next argues the ALJ erred at Step Five because there was no evidence of the availability of other jobs by region. The Court disagrees.

Step Five of the sequential disability evaluation requires that the Commissioner provide "evidence that demonstrates that other work exists in significant numbers in the national economy that [plaintiff] can do[.]" 20 C.F.R. § 404.1560(c)(2). "Significant numbers in the national economy" as applied in the context of Social Security claims is a specific term of art: "'work which exists in the national economy' means work which exists in significant numbers where [the plaintiff] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A); see also 20 C.F.R. § 404.1560(c)(1) (emphasis added). Thus, as defined in the Act, "national economy" can refer to two separate points of data: job numbers in the region where a claimant lives or job numbers in a combination of regions. See id. Either number is sufficient under the Act.

In this case, the VE provided a sum total of jobs nationwide and no regional data. The vocational expert cited the jobs of housekeeper/cleaner, marker, and ticketer with over 300,000 such positions available in total nationwide. (Tr. 139.) This Court and others have held that even smaller nationwide numbers support the inference that a job is available in multiple regions of the country. See, e.g., Gutierrez v. Comm'r, 740 F.3d 519, 529 (9th Cir. 2014) (25,000 jobs nationwide).

Plaintiff relies solely on this Court's decision in Britton v. Berryhill, No. 4:17 CV 1956 DDN, 2018 WL 4332062, at *1 (E.D. Mo. Sept. 11, 2018). However, in Britton, the Court was already remanding on other issues. The Court also acknowledged that the issue had not been decided yet by the Eighth Circuit. After further review, the Court finds no precedential authorities indicating that the ALJ may not rely on national numbers alone to meet the Commissioner's burden of showing jobs that exist in "significant numbers in the national economy." Also, the jobs at issue in this case, housekeeper/cleaner, for example, are ubiquitous; there is nothing in the nature of the

jobs cited by the VE that suggests they are limited to only one or a few regions of the nation. And plaintiff makes no argument that all three jobs cited by the VE do not exist in significant numbers in both the region where plaintiff lives and broadly in the national economy.

Britton is also distinguishable on the facts. There, for two of the three jobs cited by the vocational expert, plaintiff proved that there were apparent conflicts between the hypothetical question posed by the ALJ and the job descriptions in the Dictionary of Occupational Titles. Britton, 2018 WL 4332062, at *4 (citing Moore v. Colvin, 769 F.3d 987, 989–90 (8th Cir. 2014)). Thus, those jobs could not satisfy the Commissioner's Step Five burden. See Moore, 769 F.3d at 989–90. The plaintiff in Britton also provided vocational evidence that she could not perform the one remaining job identified by the vocational expert due to her use of prescribed narcotic medication. Britton, 2018 WL 4332062, at *5–6. Thus, Britton had shown that the Commissioner failed to meet her burden at Step Five to produce any jobs that she could perform existing in either the regional or national economy. See id.

Accordingly, for all of the above reasons, the court concludes the Commissioner met his burden at Step Five by producing evidence of job numbers available within his state or broadly available nationwide.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/s/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 21, 2019.